JODI LINKER
Federal Public Defender
Northern District of California
ELISSE LAROUCHE
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Elisse_Larouche@fd.org

Counsel for Defendant Pascoe

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 2022–00025 WHA |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | **Court:**        Courtroom 8, 19th  Floor |
| GAGE PASCOE, | **Hearing Date:**  August 17, 2022 |
| Defendant. | **Hearing Time:**  2:00 p.m. |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

BACKGROUND ..............................................................................................................1

ARGUMENT.....................................................................................................................2

I.     A sentence of five years, for a young, first-time offender with a history of substance abuse and who did not intend the tragedy here is a significant and serious sentence that accomplishes the sentencing goals of § 3553(a)..............................................................2

       A.     The nature and circumstances of the offense are extremely serious and tragic, but also demonstrate Mr. Pascoe did not have the intent to cause the outcome...2

       B.     Mr. Pascoe's history and characteristics show he is a kind, non-violent friend and family member, who became severely addicted but is now on a strong path to recovery after a year and eight months on pretrial release. .............................4

              1.     Early on in life, Mr. Pascoe struggled with a learning disability and losing his cohesive family unit and close friends. ....................................4

              2.     Dr. Gregory's neuropsychological assessment revealed neurocognitive issues, low intellectual functioning, psychological issues, a genetic vulnerability to substance abuse, and substance abuse disorders. ...........6

              3.     This Court should consider Mr. Pascoe's youth and developing brain, which contextualizes his past conduct and shows why change is possible. ...................................................................................................7

              4.     This is Mr. Pascoe's first criminal conviction and first time receiving treatment for substance abuse. ...................................................9

              5.     Mr. Pascoe has demonstrated excellent post-offense rehabilitation after nearly a year and a half of pretrial release. ...............................9

II.    A sentence of five years' prison is sufficient but not greater than necessary. ...............10

       A.     Unnamed parties in this case – Purdue Pharma and other opioid manufacturers and distributers – deceptively and aggressively marketed OxyContin with full knowledge of its addictive and dangerous nature. The Court should consider these untouchable entities' culpability and that they remain unscathed after destroying thousands of lives. ...............................................................10

       B.     The contemplated sentence is in line with federal manslaughter offenses with the same mens rea. .......................................................................13

       C.     The base offense level should be 12, rather than 38 because the offense of conviction does not include a "resulting in death or serious bodily injury" element of the offense. ........................................................................14

       D.     The need for the sentence to reflect the seriousness of the offense, protect the public, and provide Mr. Pascoe with needed medical care and correctional treatment in the most effective manner............................................17

CONCLUSION.................................................................................................................17

# TABLE OF AUTHORITIES

**Federal Cases**

*Kimbrough v. United States*,
   128 S. Ct. 558 (2007) ............................................................................................................... 2

*United States v. Johnson*, No. 05-CR-00167-WHA-5,
   2021 WL 5037679 at *2–3 (N.D. Cal. Oct. 30, 2021) ....................................................... 8

*United States v. Booker*,
   543 U.S. 220 (2005) ............................................................................................................... 2

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ......................................................................................... 2, 10

*United States v. Lawler*,
   818 F.3d 281–85 (7th Cir. 2016) ........................................................................................ 16

*United States v. Rebmann*,
   321 F.3d 540–44 (6th Cir. 2003) ........................................................................................ 16

**Federal Statutes**

18 U.S.C. § 1112 ............................................................................................................................ 13

18 U.S.C. § 3553 ................................................................................................................... 2, 3, 17

21 U.S.C. § 841 (b) (1) (C) ........................................................................................................... 14

**Other**

U.S.S.G. 5H1.1 ................................................................................................................................ 7

U.S.S.G. §1B1.1 ............................................................................................................................. 15

U.S.S.G. §1B1.2 ............................................................................................................................. 15

U.S.S.G. §1B1.3 ............................................................................................................................. 15

U.S.S.G. §2D1.1 ...................................................................................................................... 15, 16

U.S.S.G. § 2A1.4 ........................................................................................................................... 13

USSG §2A2.2 ................................................................................................................................. 14

1       This case is one of tragedy, remorse, and loss for the victim, her family, and the community.

2   Mr. Pascoe's actions, selling drugs to the victim, O.K., led to another addicted young person's

3   overdose. An addict himself, Mr. Pascoe has now demonstrated his incredible potential for

4   redemption and rehabilitation after being sober for a year and eight months after completing the New

5   Bridge residential program and aftercare. He has shown that with continued treatment and his

6   family's support, he *will not return* to his past habits of using and selling drugs. Mr. Pascoe has seen

7   the deep pain he caused a friend, families, his community, and his own loved ones. Mr. Pascoe is

8   young with no record; the Court can be confident in his sincere desire and ability to change his life.

9   Accordingly, pursuant to the plea agreement's range of five to seven years, he respectfully asks the

10   Court impose a sentence of five years' prison and significant supervision to follow.

11   **BACKGROUND**

12       In June of 2020, Mr. Pascoe was 21 years old when he was texting back and forth with a former

13   classmate and friend of his, O.K., about selling and exchanging drugs. Mr. Pascoe wanted some more

14   Adderall and O.K. wanted "Oxys," shorthand for OxyContin pills. Mr. Pascoe eventually sold O.K.

15   the "Oxys," not knowing that what he sold her were counterfeit, fentanyl-laced OxyContin 30mg pills

16   (M30s). O.K. took no more than two pills and tragically died of an overdose. These events bring Mr.

17   Pascoe before the Court. Not a day goes by that Mr. Pascoe does not think about his role in O.K.'s

18   death – a consequence he never intended but for which he takes full responsibility. Remorseful does

19   not begin to encapsulate Mr. Pascoe's feelings. And he will live knowing his role in this tragedy for

20   the rest of his life. Of course, Mr. Pascoe's struggles do not compare to nor take away the painful loss

21   of a young woman and her friends' and family's sorrow.

22       At the time of the offense and his arrest, Mr. Pascoe was smoking fentanyl every day. This case

23   and the Court's intervention of intensive substance abuse treatment have saved Mr. Pascoe's life; Mr.

24   Pascoe is grateful. He knows that he must face the severe consequence of a lengthy prison sentence.

25   For that reason, he accepted a plea with a sentencing range of five to seven years. With no prior

26   convictions or even arrests, he asks the Court to impose a sentence of five years' prison,

27   approximately a quarter of his short lifetime at the time he committed the offense.

28       Probation recommends that the Court accept the plea agreement and recommends a sentence of

six years. The defense objects to the Presentence Report's determination of the offense level of 38

because the actual "offense of conviction," and the elements to which Mr. Pascoe pleaded, do not

"establish that death or serious bodily injury resulted from the use of the substance." Accordingly, the

guideline for drug type and weight should be used, resulting in a base offense level of 12.

## ARGUMENT

In sentencing Mr. Pascoe, this Court must consider all of the directives set forth in 18 U.S.C.

§ 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United

States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

overarching statutory charge for a district court is to impose a sentence sufficient, but not greater

than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

and (6) provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

directs the Court to consider additional factors, including: the nature and circumstances of the

offense, § 3553(a)(1); the history and characteristics of the defendant, 3553(a)(1); the kinds of

sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

## I.     A sentence of five years, for a young, first-time offender with a history of substance abuse and who did not intend the tragedy here is a significant and serious sentence that accomplishes the sentencing goals of § 3553(a).

### A.     The nature and circumstances of the offense are extremely serious and tragic, but also demonstrate Mr. Pascoe did not have the intent to cause the outcome.

On June 16, 2020, Mr. Pascoe sold O.K. 13 M30 oxycodone pills, which later, per laboratory

testing, were found to contain fentanyl. PSR ¶ 17, 20, 21. On June 17, 2020, emergency personnel

responded to a call from O.K.'s girlfriend and found O.K. deceased at her home. PSR ¶ 7. An autopsy

revealed opiates, benzodiazepine, and what was deemed by the government's expert to be a lethal

1   amount of fentanyl in her system. PSR ¶ 8, 22, 23. Later, a bag of 11 M30 pills and other prescription

2   bottles were found in O.K.'s room. PSR ¶ 20, 21.

3       The government's search of Mr. Pascoe's cellphone revealed correspondence between Mr.

4   Pascoe and O.K., who were former classmates and friends, beginning on June 3, 2020. *See* PSR ¶¶

5   10-14. Mr. Pascoe wanted to buy Adderall from O.K. and O.K. wanted "Oxys" from Mr. Pascoe. *See*

6   *id*. On June 3, Mr. Pascoe offered to get O.K. more Oxys, and O.K. followed up numerous times on

7   June 10, 11, 13, 15, and 16. *Id*. On June 10, O.K. stated she was "running low and wanna cop more."

8   *Id*. ¶ 11. O.K. was persistent when Mr. Pascoe did not respond as soon she wanted with confirmation

9   of the sale. *See id*. ¶ 11-13. On June 15 she texted, "Yeah make it happen I want them today"; "Stay

10  in contact today I need those. I'm completely out." *Id*. ¶ 13-16. On June 16, after Mr. Pascoe didn't

11  follow up with the sale on June 15, O.K. sent successive messages begging for the Oxys and asking

12  how long it would take. *Id*. ¶ 16. After getting an estimated time, the two arranged for O.K. to drive

13  to Mr. Pascoe's house on June 16 where she bought the Oxys from him. *Id*. ¶ 16-19. The exchange of

14  text messages between Mr. Pascoe and O.K. show that O.K. was suffering from addiction given her

15  acute desperation to get more Oxys once she'd run out. For his part, Mr. Pascoe's actions show that

16  while he had the connection to get the pills, he was not an entrepreneurial drug dealer with supplies at

17  his fingertips, but an addict buying and selling with another addict.

18      The painful reality remains that a young woman lost her life. The widespread over prescription,

19  availability, use, and abuse of prescription pills is an epidemic that has taken the lives of so many

20  young people. And any case where the Court must consider the loss of a life is an extremely serious

21  one meriting a serious punishment. Still, the sentence imposed here cannot focus solely on

22  retribution, but must also be tied to Mr. Pascoe's unique circumstances and the related need to deter,

23  protect the public, and provide rehabilitation. 18 U.S.C. § 3553(a)(2). The facts of this case, and Mr.

24  Pascoe's letter to the Court, show that Mr. Pascoe did not intend the consequences here and had no

25  violent or malicious intent. *See* Declaration of Elisse Larouche (Decl. Larouche) ¶ 2, Ex. A Pascoe

26  Letter. His offense is analogous to strict liability or gross negligence or recklessness. Mr. Pascoe's

27  background and letters of support demonstrate that he is a generous and loving person, but that his

28  prior actions have been clouded by the drugs that controlled him.

**B.     Mr. Pascoe's history and characteristics show he is a kind, non-violent friend and family member, who became severely addicted but is now on a strong path to recovery after a year and eight months on pretrial release.**

**1.     Early on in life, Mr. Pascoe struggled with a learning disability and losing his cohesive family unit and close friends.**

Growing up in a big family as one of six kids, family was and is extremely important to Mr. Pascoe. PSR ¶ 50. This is evident through the numerous family support letters submitted on his behalf. *See* Larouche Decl. ¶ 3, Ex. B. Mr. Pascoe's younger sister describes him as her "best friend," "hero," and "protector" growing up. Ex. B. at 8, Logan letter. Someone who "has the biggest heart and always puts others first." *Id*. Another sister shared that "Gage never failed to show up and help me out no matter what I was going through." Ex. B at 9-10, Presley letter.

Painful experiences, however, dimmed the light in Mr. Pascoe over time. Growing up, he witnessed his parents in frequent verbal arguments. PSR ¶ 52; Larouche Decl. ¶ 4, Ex. C, Dr. Gregory Neuropsychological Assessment ("Dr. Gregory Report") at 2.[1] At 11, his parents separated and later divorced. PSR ¶ 52. His father relates that the divorce was not amicable and that "Gage always tried to shield his sisters and brothers from the bitterness and hostility. In hindsight, I think this had a terrible effect on him." Ex. B at 6-7, Brent Pascoe letter.

Mr. Pascoe remembers that after learning his parents were getting divorced, he felt sad, angry, and that he was the reason for the divorce. Dr. Gregory Report at 2. The situation became more protracted when his mother fought his father for full custody and Mr. Pascoe was compelled to "pick a side" between his parents. *Id*. at 3. Mr. Pascoe and his siblings spent the next few years as pawns in his parents' nasty legal battle, shuffled back and forth until a joint custody agreement was reached. *Id*. His feelings of sadness developed into anger, depression, and frustration as he did not know how to process his emotions while his family was ripping apart. *Id*.

Aligning with the timing of the divorce, Mr. Pascoe started having behavioral issues at school. *Id*.; PSR ¶ 54. He did not want to listen to adults, skipped school, and began arguing and fighting with others. PSR ¶ 54. At just 11 or 12 years old, he was found with marijuana; with just one parent

---

[1] At the request of defense counsel, Dr. Amanda Gregory conducted a Neuropsychological Assessment of Mr. Pascoe, which included a social history, review of Mr. Pascoe's school and other health records, independent psychological testing, and recommendations. *See* Ex. C.

caring all the children, there was less supervision. *Id*. At times, his father tried to manage Mr. Pascoe's behavior physically, by slapping, hitting, or punching him. Dr. Gregory Report at 4. Mr. Pascoe's brother would also beat him up from age 12 until high school. *Id*. In reflecting on his childhood, Mr. Pascoe recognizes that in his early adolescence, he was acting out and provoking others. *Id*.

Academically, Mr. Pascoe performed well in elementary school, but coinciding with his parents' divorce and resulting behavioral issues, his grades sank to a D average beginning in middle school. *Id*. at 8. At the same time, he began receiving special education services due to his diagnosis of Attention-Deficit/Hyperactivity Disorder and learning disabilities. *Id*. at 5, 8; PSR ¶ 65. He was prescribed medication and tried different pills during middle school, but they made him zone out, reduced his appetite, and he was no longer his social self. Dr. Gregory Report at 5; PSR ¶ 65. Consistent with his ADHD diagnosis, Mr. Pascoe's school records show that while some teachers found him to be a pleasure in class because of his demeanor, he had late/missing assignments, tardiness, disruptive behavior, and problems with distractibility and organization. Dr. Gregory Report at 9. Notes from his special education Individualized Education Program noted his respectful attitude but need for support with executive functioning and issues focusing in class. *Id*. at 9. In middle and high school, concerns arose of whether Mr. Pascoe was coming to school sober and his related low self-esteem. *Id*.

One area where Mr. Pascoe excelled and showed motivation was athletics. *Id*. at 9; PSR ¶ 51. He was a competitive swimmer, with early morning workouts five days a week. Dr. Gregory Report at 9. He competed in the Junior Olympics. PSR ¶ 51. However, by high school, he started using drugs more heavily and his commitment to swimming declined. *Id*. Issues in school continued for Mr. Pascoe and he was eventually expelled from high school and a continuation school for having marijuana. Dr. Gregory Report at 9.

In his later teenage years, Mr. Pascoe also lost his grandfather and several close friends, which led him to increasingly turn to drugs to self-medicate. PSR ¶ 55, 56. At 19, one of Mr. Pascoe's best friends was killed after being let out on the freeway by friends on their way home from drinking at a party. PSR ¶ 55. The friend was hit by a car and killed. *Id*. Mr. Pascoe felt responsible for his friend's

death because he had missed several calls from the friend that same night. *Id*. This loss and his feelings of responsibility led to a significant escalation of substance abuse. *Id*. Later, Mr. Pascoe lost friends to suicide and drug overdoses. *See* PSR ¶ 56. While a logical person under the influence of drugs may have taken this as a warning sign, Mr. Pascoe was overcome with sadness, depression, and anger with these losses and already was deeply addicted himself. *See id*.

Witnessing their brother's downward turn, his siblings share: "Drugs took my sweet, hyper brother and turned him into a walking zombie." Ex. B at 4, Sydney letter; "One day it all changed, he started fighting his own demons instead of the monsters under my bed," and "seeing the light leave from . . . one of my heroes was hard and destroyed me to see him fall."  Ex. B at 8, Logan letter.

2. **Dr. Gregory's neuropsychological assessment revealed neurocognitive issues, low intellectual functioning, psychological issues, a genetic vulnerability to substance abuse, and substance abuse disorders.**

Dr. Gregory performed a neuropsychological assessment of Mr. Pascoe, which revealed a history and present issues of intellectual functioning, psychological disorders, and substance abuse. Dr. Gregory Report at 18. Testing showed low intellectual abilities and impaired functioning, consistent with Mr. Pascoe's poor testing and poor performance while in school. *See* Dr. Gregory Report at 12-14, 18. Mr. Pascoe's Full Scale IQ was in the 14th percentile, the low average range of intellectual functioning compared to same-age peers. *Id*. at 12. Testing of Executive Functioning and Attention, Working Memory and Processing Speed yielded average and low average scores and severely impaired processing speed when sustained attention was required. *Id*. at 14, 18. Dr. Gregory found that Mr. Pascoe's testing results were consistent with deficits often associated with ADHD. *Id*. at 18. "Such deficits are also suggestive of a weakness in prefrontal cortex functioning, the region of the brain that plays a central role in executive functioning and attention, and the neurological 'brakes' on emotions and behavior." *Id*.

Psychological testing also exposed a history of depression and anxiety, originating with the sadness and anger he felt after his parents' divorce at age 11. *Id*. His marijuana use shortly thereafter, followed by behavioral and other drug issues at home and at school were outgrowths of these feelings. *See* Dr. Gregory Report at 18, 19. Further traumatic events, including the loss of his best friend and his related guilt and losing other friends, compounded depression and substance abuse; he

1   began to have suicidal thoughts. *Id*. at 17, 19.

2       Mr. Pascoe's family, while a loving one, exposed him to addiction through family members

3   using drugs and a history of familial addiction that gave Mr. Pascoe "a genetic vulnerability for

4   substance use issues." *Id*. at 19. His brother exposed him to drug use at an early age and his brother

5   had to eventually go to rehab for opiate addiction. *Id*. Several family members, going back to past

6   generations, have struggled with drug and/or alcohol abuse. *Id*. Both of these factors set Mr. Pascoe

7   up to fall more easily into addiction. Mr. Pascoe's drug use and the severity escalated to fentanyl,

8   alcohol, and marijuana use on a daily basis and frequent use of Xanax up to his arrest. *Id*. He sold in

9   part to fund his addiction. *Id*.

10       Dr. Gregory concluded that Mr. Pascoe has a history of cognitive symptoms of depression,

11   including guilt, feelings of worthlessness, hopelessness and low self-worth. *Id*. Mr. Pascoe also

12   reported experiencing sadness/depression, anxiety and stress, feeling guilt and shame of his behavior

13   and specifically about the death of O.K. *Id*. at 17. Mr. Pascoe's "history of polysubstance abuse

14   result[ed] in a significant negative impact on his life," including issues in his relationships that caused

15   additional stress, "further aggravating his tendency to use substances." *Id*. at 16.

16       Dr. Gregory ultimately diagnosed Mr. Pascoe with: opiate and sedative use disorders in early

17   remission; alcohol use disorder in early remission; cannabis use disorder in early remission;

18   depressive disorder with anxious distress in partial remission; and ADHD. *Id*. at 20. Dr. Gregory

19   noted Mr. Pascoe's insight into his past of self-medicating guilt, shame, and pain and that he had

20   come to see treatment was necessary to confront the feelings he numbed with drugs. *Id*. at 17.

21          **3.**    **This Court should consider Mr. Pascoe's youth and developing brain,**
22                 **which contextualizes his past conduct and shows why change is possible.**

23       The U.S. Sentencing Guidelines state that age, including youth, may be relevant in determining

24   whether a departure is warranted and this Court should consider Mr. Pascoe's youth in determining

25   the appropriate sentence here. U.S.S.G. § 5H1.1. This Court has recently recognized the mitigating

26   role of a defendant's youth at the time of offense and the import of social science regarding brain

27   maturation, as endorsed by the U.S. Sentencing Commission. *United States v. Johnson*, No. 05-CR-

28   00167-WHA-5, Dkt. 2063, 2021 WL 5037679 at *2–3 (N.D. Cal. Oct. 30, 2021). Reviewing the U.S.

1   Sentencing Commission's recent report, the Court noted that "brains continue to develop until

2   approximately age twenty-five, and developmental differences relevant to sentencing generally

3   persist until around that age." *Id.* at 3. As the Supreme Court has recognized, and Dr. Gregory's

4   report echoes, impulsivity, proclivity for risk, and inability to assess consequences are traits present

5   as the brain is still developing. *Id.* (citing *Miller v. Alabama*, 567 U.S. 460, 472–73 (2012). These

6   traits "lessen . . . moral culpability and enhance the prospect that, as years go by and neurological

7   development occurs, [one's] deficiencies will be reformed." *Id.* (internal citations omitted and

8   cleaned up).

9       Dr. Gregory's report emphasizes that Mr. Pascoe's age – just 21 when he committed the

10   offense – is critical to contextualizing his past conduct and capacity to change. Dr. Gregory Report at

11   19. Research supports that Mr. Pascoe's prefrontal cortex, while in his early 20s, is not yet fully

12   mature, affecting behavioral and emotional development in ways that are directly relevant to

13   culpability and capacity to rehabilitate. *Id.* "The prefrontal cortex is responsible for functions that

14   include attention, complex planning, decision-making, impulse control, organization, risk

15   management, self-awareness, social judgment, short-term memory, and empathy, functions that are

16   relevant to criminal behavior, culpability and capacity to rehabilitate." *Id.* Consistent with Mr. Pascoe

17   performing well on pretrial release as he grows older, risk-taking and sensation seeking behaviors

18   plateau between ages 23 and 26. *Id.* Further, Dr. Gregory states that young adults show greater

19   capacity for rehabilitation compared to older adults because they are still in a phase of significant

20   neurological and emotional maturation. "With ongoing treatment and sobriety, [Mr. Pascoe] has the

21   opportunity to mature without the influence of disinhibiting and numbing substances that can impair

22   judgment and inhibit appropriate emotional reactions and development." *Id.* at 20.

23       Although Mr. Pascoe's family had been a previous source of drug exposure and vulnerability to

24   addiction, his family is now openly addressing and working through his addiction. His brother

25   successfully completed opiate addiction rehabilitation and has been clean for over four years. *Id.* at

26   19. His family's letters of support show that they are addressing the issue head on and supporting Mr.

27   Pascoe. Accordingly, Mr. Pascoe's affable personality, openness, progress in treatment, family

28   support, vocational goals, sincere expressions of remorse, and recognized need for treatment and

sobriety, are strengths that bode well for his continued rehabilitation and lack of future criminal conduct. *See* at 20.

### 4. This is Mr. Pascoe's first criminal conviction and first time receiving treatment for substance abuse.

Mr. Pascoe has no prior convictions or even arrest of any kind. *See* PSR ¶¶ 43-48. This case is his first contact with law enforcement and the Court can be assured it will be his last. Prior to this case, despite using drugs since he was approximately 11 years old, Mr. Pascoe had never received substance abuse treatment. PSR ¶ 66. But for a few counseling sessions after his parents' divorce, he'd never received any counseling or psychotherapy.

Mr. Pascoe's rehabilitation – from daily use of life-threatening drugs to no positive drug tests for a year and eight months – is incredible. His recovery is incredible not just for him and his family, but for the safety more broadly. Research from Harvard Medical School shows it takes the typical opioid-addicted user eight years-and four to five treatment attempts to achieve remission for just a single year.[2] Mr. Pascoe successfully completed the ninety-day residential program at New Bridge, made the challenging transition to a sober living environment, and now lives with his father while still participating in aftercare. PSR ¶¶ 66, 75. While at New Bridge, Mr. Pascoe had to confront emotions he had suppressed and self-medicated for years. He had to confront his wrongdoing and those who he hurt. This was not an easy process, but one that is having lasting effects.

### 5. Mr. Pascoe has demonstrated excellent post-offense rehabilitation after nearly a year and a half of pretrial release.

In addition to his momentous strides in overcoming his serious substance use disorder, Mr. Pascoe has had a stable full-time job and just recently obtained his GED. PSR ¶¶ 77, 80; Larouche Decl. ¶ 5, Ex. D. Mr. Pascoe has worked at a restaurant for over a year and his employer's letter of support demonstrates his excellent work ethic. PSR ¶ 80; Ex. B at 13, Singh letter. Mr. Pascoe also showed commitment to bettering himself by obtaining his GED. Having ADHD and struggling in school growing up, the GED prep courses and exams were a daunting task for Mr. Pascoe. But he committed to succeeding and passed four of the five subject matter exams on the first try. He failed

---

[2] Beth Macy, *Dopesick*, *Dealers, Doctors, and the Drug Company That Addicted America* at 243 (2018).

the math exam on the first try, the subject most difficult for him. On the second try, however, he passed the math exam and now has his GED certificate. It is clear that Mr. Pascoe is overcoming many of the struggles of his past and becoming a better version of himself through the support of pretrial supervision and his family.

Family members of Mr. Pascoe also share that they "finally ha[ve] my brother back." Ex. B at 10, Presley letter. As the letters of support recount, once lost to drugs and deep in his psychological disorders, Mr. Pascoe is now positively involved with his loving family after coming clean about the depth of his addiction. *See* Ex B at 1-11. This support network, including the positive role model of his now-sober brother, and Mr. Pascoe's openness with his network, is a critical pillar to his rehabilitative success that the Court should consider in determining what prison time is *necessary*.

## II.  A sentence of five years' prison is sufficient but not greater than necessary.

This Court should impose a sentence of five years' prison, which is sufficient to achieve the goals of sentencing, but *not greater than necessary. Carty*, 520 F.3d at 991. Five years, for a first-time, youthful offender with a substance use disorder and lack of malicious mens rea is a severe punishment that is commiserate with the seriousness of the offense and yet, not greater than necessary to ensure protection of the public, deterrence, and rehabilitation. The Court should consider the greater context of the opioid epidemic, offenses with similar mens rea and losses of life, and the PSR's overstated offense level in finding five years' prison is the appropriate sentence here.

### A.  Unnamed parties in this case – Purdue Pharma and other opioid manufacturers and distributers – deceptively and aggressively marketed OxyContin with full knowledge of its addictive and dangerous nature. The Court should consider these untouchable entities' culpability and that they remain unscathed after destroying thousands of lives.

In 1996, Purdue Pharma introduced OxyContin as a miracle drug for all kinds of chronic pain.[3] The company touted it as a safe drug, with addiction rates of less than 1 percent.[4] Devoting dollars and energy "to evangelize to doctors and dentists" that prescribing "OxyContin for pain was the moral, responsible, and compassionate thing to do" for patients with any pain, while at the same time national healthcare associations were adopting the idea of pain as "the fifth vital sign," Purdue started

---

[3] *Id*. at 27.
[4] *Id*.

1     its journey to profiting from pain and addiction.[5] But even early on, some doctors, community

2     advocates, and families of those who were addicted and died from addiction, demanded action from

3     Purdue and the FDA, explaining that OxyContin's effects were different than any drug before it,

4     causing faster and more rampant addiction, along with increased criminal conduct as individuals were

5     desperate to get more and avoid becoming "dopesick" with brutal withdrawal symptoms.[6] Federal

6     law enforcement, the FDA, and Purdue ignored or dismissed the concerns, labeling them as

7     afflictions of criminal abusers.[7] Purdue continued its unfettered marketing of OxyContin.[8] The drug's

8     hold spread in communities nationwide and "pharm parties," where teens exchanged easily obtained

9     pills – from parents' medicine cabinets, from a wisdom tooth surgery, from a sports' injury, from a

10    culture of overprescribing as a quick fix – were commonplace.[9] When "OxyContin and other opioid

11    pills became too expensive or cumbersome to get, illegal drug peddlers would step in to fulfill the

12    market demand, just as they had done a century earlier when heroin became illegal."[10]

13         Despite all the evidence that Purdue and its owners, the Sackler family, knew that OxyContin

14    was overprescribed, targeted to the vulnerable, diverted, and abused, resulting in increased deaths and

15    crime rates, nothing was done by those in power to truly stop Purdue.[11] Even after a damning federal

16

---

17    [5] *Id*. at 27, 32–33 ("Industrywide, pharmaceutical companies spent $4.04 *billion* in direct marketing

18    to doctors in 2000, up 64 percent from 1996.") (emphasis in original). Pharmaceutical sales reps showered doctors with gifts and perks to get in the door and convince doctors to prescribe more and

19    more OxyContin. *See id*. at 32–34. The 2021 TV mini-series is based off the *Dopesick* book and details the explosion of OxyContin addiction in Appalachian coal mining towns that Purdue targeted.

20    Trailer available here: https://www.imdb.com/title/tt9174558/.
        [6] *See id., e.g.*, at 38–39, 46–47

21    [7] *See id., e.g.*, at 40, 46–47, 50–51.
        [8] *See id., e.g.*, at 40, 46–47, 50–51.

22    [9] *See id., e.g.*, at 58, 60, 134–35 ("Between 1991 and 2010, the number of prescribed stimulants increased tenfold among all ages, with prescriptions for attention-deficit-disorder drugs tripling

23    among school-age children between 1990 and 1995 alone.") *Dopesick* explains that stimulant usage often becomes a gateway to harder drugs. *Id*. at 135.

24    [10] *See id, e.g.*, at 60. Often individuals who started with a prescription pill but then moved to heroin or other drugs that were cheaper or more accessible or because Oxys eventually became abuse-

25    resistant. *See, e.g., id*. at 185, 190. In 2013, heroin-related deaths, mostly affecting young men, were up 39 percent over the previous year. *Id*. at 185

26    [11] *See id, e.g.*, at 64–96. Throughout, *Dopesick* chronicles Assistant United States Attorneys, doctors, community members, law enforcement, parents of children addicted or dead from OxyContin, and

27    other actors' repeated unsuccessful efforts to make law makers, the FDA, courts, and Purdue address the high addiction risk of OxyContins and its effects on communities. The book sets forth how

28    Purdue persuaded doctors and others of the drugs' benefits and the need to prescribe more and more in vulnerable communities while the company swept under the rug any issue with addiction as attributable to criminals and deplorable addicts. As one doctor stated, "The most damaging thing

investigation and prosecution by the U.S. Attorney's office in West Virginia, the result was three top executives pleading to *misdemeanor charges* and paying a hefty fine from the firm's profits.[12] As the AUSA stated, "you can't put a corporation in jail"; "The corporation feels no pain."[13]

While families were spared no pain in the over 500,000 opioid overdoses, the Sackler family has largely remained unscathed due to corporate loopholes.[14] In 2015, they were on *Forbes's* "America's Richest Families" list with an estimated net worth of $14 billion.[15] Individuals like the Sacklers and Purdue executives were the masterminds that started and fanned the flames of the opioid epidemic plaguing our communities. Public policy counsels that this Court should consider their role in creating easy access to dangerous prescription pills and the resulting demand, addiction, diversion, and developing of dangerous fakes to meet the demand they created.

Mr. Pascoe's role in this offense and the tragic death of O.K. is too familiar in the many years of the opioid epidemic's wrath. Mr. Pascoe should not bear alone the blame for this epidemic's vast effects. The well-resourced, privileged, and insulated actors of Purdue, and other opioid manufacturers, are as culpable and have yet to consider a day in prison, while young, addicted Mr. Pascoe faces years in prison. Unlike Purdue, whose former president and co-chairman of the board testified that "neither the Sackler family, the company, nor its products bore any responsibility for the opioid epidemic,"[16] Mr. Pascoe has taken responsibility for his actions. It is alluring to distill our community's opioid problems to the bad actor in front of the Court today and exercise tangible, direct punishment against him. The Court, however, should consider the broader context that created the

_____

Purdue did, it wasn't the misbranding of OxyContin they got in trouble for. It was that they made the medical community feel more comfortable with opioids as a class of drugs," "[b]ut had the FDA been doing its job properly with regard to opioids, we never would have had this epidemic." *Id*. at 185.

[12] *Id*. at 84.

[13] *Id*. at 96.

[14] Robert Preidt & Robin Foster, U.S. News & World Reports, *Oxycontin Maker Purdue Dissolved, Family to Pay $4.5 Billion in Bankruptcy Settlement*, Sept. 2, 2021, (summarizing that Purdue will pay $4.5 Billion under a settlement to end thousands of lawsuits brought against it for creating the highly addictive painkiller OxyContin but that because of conditions and the offshore location of much of the Sackler family's money, they are largely immune from liability and will remain one of the richest families in the U.S.), available at: https://www.usnews.com/news/health-news/articles/2021-09-02/oxycontin-maker-purdue-dissolved-family-to-pay-45-billion-in-bankruptcy-settlement

[15] Macy, *supra*, at 95.

[16] Preidt, *supra*.

1 unstoppable opioid epidemic that led to the case before the Court.

2     **B.**    **The contemplated sentence is in line with federal manslaughter offenses with the same mens rea.**

3

4     "*There can be no crime, large or small, without an evil mind. In other words, punishment is the sequence of wickedness. Neither in philosophical speculation, nor in religious or moral sentiment, would any people in any age allow that man should be deemed guilty unless his mind was so. It is therefore a principle of our legal system, as probably it is of every other, that the essence of an offense is the wrongful intent, without which it cannot exist.*"

5

6

7

8     Joel Bishop, *A Treatise on Criminal Law*, secs. 287, 205, 1865.

9     The Court should the mens rea, or lack thereof, in determining the appropriate sentence here.

10 The federal sentencing guideline for involuntary manslaughter, which also involves a tragic loss of

11 life despite no intention of such, is illustrative here. Chapter 18 U.S.C. § 1112 – Manslaughter, is

12 defined as the unlawful killing of a human being without malice. Involuntary manslaughter occurs

13 when the defendant committed an act that might produce death and acted with gross negligence,

14 defined as wanton or reckless disregard for human life.[17] Individuals can be federally prosecuted for

15 involuntary manslaughter when the individual is recklessly operating a vehicle due to intoxication

16 and causes the death of another. The base offense level for this offense is 22.[18] For a person who

17 pleads guilty and has no criminal history, the guideline range is 30-37 months. The range is even less,

18 18 to 24 months, for involuntary manslaughter that involves reckless conduct more generally.[19] The

19 guidelines for these offenses underscore the importance of long-standing mens rea principles.

20     While even unintended offenses must be punished, and Mr. Pascoe assumes responsibility, it

21 does not serve the sentencing goals to over incarcerate an individual who did not intend for his

22 actions to cause a loss of life. Without the requisite intent and where an individual was operating

23 under addiction rather than logical choices, there are diminishing returns of a longer prison sentence.

24 Principles of criminal law counsel that unknowing, albeit reckless, offenders, should not be punished

25

26

27 [17] Ninth Circuit Jury Instructions, 16.4 Manslaughter-Involuntary (18 U.S.C. § 1112), available at: https://www.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Criminal_Instructions_2022_3.pdf.

28 [18] U.S.S.G. § 2A1.4(a)(2)(B), Base offense level (reckless operation of a means of transportation) 22.
[19] *Id*. at (2)(A), 18-3 for acceptance = 15 and CHC I.

as severely as those who knowingly caused tragic results of fentanyl use.

Lower federal guidelines for violent offenses, those often deemed most deplorable and dangerous to the public, also shed light on an appropriate sentence in this case. For example, a CHC I defendant who commits aggravated assault with a dangerous weapon, like a knife or firearm, *strangles* his intimate partner, and causes *permanent or life-threatening* injuries, faces a post-guilty plea guideline range of 46 to 57 months.[20] Mr. Pascoe has none of these violent characteristics and faces at least five years under the plea agreement.

The statutes and guidelines for drug offenses, especially those that involve death, are much more severe than involuntary manslaughter due to intoxication and violent offenses. But the punitive laws implemented as part of the war on drugs and moral panic of the explosion of drugs have failed. The history of severe federal drug sentencing laws shows that they yield high costs and imprisonment, but not reduced drug use or recidivism.[21]

There are very real, serious dangers facing our communities and that those tasked with protecting the public must act on, but higher prison sentences for people like Mr. Pascoe, who suffer from their own addiction, lack a mens rea to cause harm, and at most, are low-level dealers, will not result in greater deterrence or a reduction in the drug and overdose epidemic. The Court should consider Mr. Pascoe's lesser intent and public policy reasons counseling a lower prison sentence.

**C.     The base offense level should be 12, rather than 38 because the offense of conviction does not include a "resulting in death or serious bodily injury" *element* of the offense.**

A plain reading of the applicable guidelines and case law counsel that the PSR's higher offense

---

[20] *See* USSG §2A2.2 (base offense level of 14, to which 4 levels are added for use of a dangerous weapon, 7 levels added for permanent or life-threatening bodily injury, and 3 levels for strangling a spouse, but where the cumulative enhancements are capped at 12 levels to the base offense level of 14, for offense level of 26; resulting at final offense level 23 with acceptance).

[21] PEW Trusts, *More Imprisonment Does Not Reduce State Drug Problems*, (Mar. 8, 2018), https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2018/03/more-imprisonment-does-not-reduce-state-drug-problems (reporting that as the federal prison population increased from 1980 to 2013, there was not a convincing public safety return with self-reported use of illegal drugs increasing between 1990 and 2014 and roughly one third of federal drug offenders who leave prison on supervision committing new crimes or violating conditions of release); *see also* U.S. Dep't of Justice, National Institute of Justice, *Five Things About Deterrence*, (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (finding that increasing the severity of punishment does little to deter crime).

SENTENCING MEMORANDUM
*PASCOE*, CR 2022–00025 WHA

level of 38 should not apply. Mr. Pascoe pleaded guilty to one count of violating 21 U.S.C. § 841(a) and (b)(1)(C), distribution of fentanyl. PSR ¶ 1, 2. The elements of the offense he admitted to in his plea agreement *do not* include the "resulting in death or serious bodily injury" element. *See* Plea Agreement, Dkt. 64 ¶ 1. Because "resulting in death or serious bodily injury" is not an actual element to which Mr. Pascoe pleaded guilty, the heightened offense level of 38 does not apply.

Typically, the Court can consider relevant conduct pursuant to U.S.S.G. §§ 1B1.2 and 1B1.3 and may find that another guideline or enhancement applies. This is because the guidelines define "offense" to include "the offense of conviction *and all relevant conduct under* § 1B1.3. U.S.S.G. § 1B1.1 n.1(I)." (emphasis added). From this definition, it is clear that the "offense of conviction" and "relevant conduct" are distinct, but encompassed under the broader definition of "offense." In contrast, the guideline the PSR applies in this case, U.S.S.G. § 2D1.1(a)(2), only applies when the "offense of conviction" – not just the offense or the offense of conviction and all relevant conduct – *establishes* that death or serious bodily injury resulted from the use of the substance. Attempts to justify imposition of the high offense level are unavailing.

First, the PSR's justification cites U.S.S.G. § 1B1.3, which generally explains how to apply the guidelines, including relevant conduct. PSR Objections ¶ 10. But that general provision doesn't apply here, because it carves out an exception for those offenses "[u]less otherwise specified." U.S.S.G. § 1B1.3. Because the enhancement the PSR seeks to impose only applies when the "offense of conviction" establishes certain facts, this enhancement is outside of the typical guideline offense and is one "otherwise specified." The term "offense of conviction" is a narrower term under the umbrella of "offense" and by specifically using the term "offense of conviction" in the § 2D1.1(a)(2) enhancement language, the drafters narrowed its application to elements of an offense, not all relevant conduct.

Second, after citing to the factual basis in the plea agreement, probation responds that "pursuant to U.S.S.G. §1B1.2 and §1B1.3, relevant conduct can be used to determine the appropriate guideline calculation." PSR Objections ¶ 12. The factual basis of the plea agreement are not elements of the offense. Mr. Pascoe only pleaded to the elements of the offense of conviction – that he believes the government could prove that he knowingly distributed fentanyl and he knew he distributed fentanyl

1    or some other federally controlled substance. Dkt. 64 ¶ 1.

2         Third, at least one judge in this District has agreed with the defense. In *United States v.*

3    *Robledo*, 5-21-cr-114, Judge Freeman agreed with both the defense and the government that the

4    higher offense level of 38, as proposed by probation, did *not* apply. Dkt. 79 at 2 n.2 (Def. Mem.

5    noting Judge Freeman's ruling at prior hearing that enhanced offense level did not apply and finding

6    the adjusted offense level to be 13). Multiple Circuits have also similarly held. *See, e.g.*, *United*

7    *States v. Lawler*, 818 F.3d 281, 284–85 (7th Cir. 2016) (noting that Guidelines define "offense of

8    conviction" to exclude relevant conduct, and joining the Third, Fifth, and Sixth Circuits to hold that

9    enhanced base offense level of 38 under §2D.1(a)(2) applies "only when a resulting death (or serious

10   bodily injury) was an *element of the crime of conviction*") (emphasis added); *United States v.*

11   *Rebmann*, 321 F.3d 540, 543–44 (6th Cir. 2003) (holding that the heightened base offense level of 38

12   applies "only when the elemental facts supporting the 'offense of conviction' establish beyond a

13   reasonable doubt that death resulted from the use of the controlled substance," and explaining that

14   under the Guidelines, "the term 'offense of conviction' describes only the precise conduct

15   constituting the crime for which the defendant was convicted, and does not include non-offense

16   relevant conduct" citing U.S.S.G. § 1B1.2(a)).

17        Because the sentencing enhancement does not apply, the base offense level should be based on

18   the quantity and type of drug per § 2D1.1. Mr. Pascoe sold 13 M30 pills that based on laboratory

19   analysis were determined to contain, in part, fentanyl. According to government laboratory analysis,

20   each pill weighed 0.126 grams, resulting in a total of 1.638 grams. PSR ¶ 21. Even though fentanyl

21   was not determined to make up the entire composition of the pill, the total weight of the pill is used

22   for guideline purposes. For 4 grams or less of fentanyl, the offense level is 12. U.S.S.G. §2D1.1 (table

23   14). The adjusted offense level is 10 after -2 for acceptance of responsibility. Should the Court find

24   this level underrepresents the conduct, it can still vary upward but should not apply probation's

25   offense level of 38, which is contrary to established principles of statutory construction and relevant

26   case law.

27

28

**D.     The need for the sentence to reflect the seriousness of the offense, protect the public, and provide Mr. Pascoe with needed medical care and correctional treatment in the most effective manner.**

The offense and the loss of a young life in this case are very serious, meriting the significant first-time, five-year prison sentence Mr. Pascoe requests. This is a frightening punishment for a 23-year-old with no other interactions with the criminal justice system. He will be exposed to criminogenic behavior and given his slight build and youthful appearance, he will face psychological and physical dangers. Mr. Pascoe will be trying to survive for the five long years in prison.

After approximately one year and eight months on pretrial release with no serious violations, no positive drug tests, and no new criminal behavior, Mr. Pascoe has shown that he can be law-abiding member of the community. It is the substance abuse treatment, his support networks, and supervision by pretrial that have facilitated this immense change in his behavior. Dr. Gregory's recommendations emphasize that "Mr. Pascoe will need ongoing support and treatment for his substance abuse disorders," including consistent follow-through on treatment services, support groups, and psychotherapy. Dr. Gregory Report at 20. Her recommendations also included obtaining his GED, which he accomplished, and vocational training so he has a career to devote himself to. *Id*. In prison, Mr. Pascoe will not have access to the same medical care, correctional treatment, support networks, and pro-social contacts, which have proven to be effective. Instead, he will have negative peers, less treatment programming, no access to his family, and likely greater access to drugs. Any prison sentence longer than five years will be counterproductive to the goals of sentencing.

## CONCLUSION

At 21 years old, Mr. Pascoe made the worst decision of his life by selling Oxys to a friend, which resulted in her heartbreaking overdose death. Mr. Pascoe can't take back his actions as much as he wishes he could, but he has demonstrated he can change and live a law-abiding and drug-free life. The Court can be assured that a sentence of five years' prison and supervision to follow is significant but not greater than necessary to achieve the sentencing goals of § 3553(a).

1

2      Dated:      August 10, 2022                    Respectfully submitted,

3
                                                      JODI LINKER
4                                                     Federal Public Defender
                                                      Northern District of California
5
                                                            /S
6                                                     _____
                                                      ELISSE LAROUCHE
7                                                     Assistant Federal Public Defender

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28